UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENIUS GROUP LIMITED.,<br><br>     *Petitioner,*<br> v.<br><br>LZG INTERNATIONAL, INC., MICHAEL THOMAS MOE and PETER RITZ,<br><br>     *Respondents.*<br><br>VSTOCK TRANSFER, LLC<br><br>     *Nominal Respondent.* | CIVIL ACTION NO. _____ |

**PETITION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION IN AID OF ARBITRATION**

Petitioner Genius Group Limited ("Petitioner" or "Genius"), through counsel alleges as follows:

1. This application is made for injunctive relief in aid of a currently pending arbitration proceeding ("Arbitration").

2. On October 30, 2024, Genius submitted an application to commence Arbitration with the International Chamber of Commerce ("ICC") pursuant to a mandatory arbitration clause contained in Section 18.1 of the January 24, 2024 purchase agreement ("Asset Purchase Agreement") between Genius and Respondent LZG International, Inc. ("LZG"). *See* **Exhibit 1**.

The Parties

3. Petitioner Genius is a public limited company duly organized and operated under the Laws of Singapore with a principal place of business located at 8 Amory Street, #01-01 Singapore 049950.

4. Respondent LZG is a Florida corporation with its principal place of business located at 2157 S. Lincoln Street, Suite 104, Salt Lake City, Utah 84106.

5. Respondent LZG has its headquarters located at 135 West 41st Street, Suite 5-104, New York, New York 10036, and is traded on the OTC Pink Markets, in New York.

6. Respondent Michael Thomas Moe ("Moe") is an individual residing in the State of Texas, with a permanent residence located at 4125 Turtle Creek Boulevard, Dallas Texas 75219.

7. Respondent Moe is a director of LZG.

8. Respondent Moe served as Chairman of the Board of Genius until he resigned on September 30, 2024, and served on Genius' Board of Directors until he resigned on October 9, 2024.

9. Respondent Moe is one of Genius' largest individual shareholders, owning 5,524,945 shares of Genius common stock (2.97% of outstanding Genius common stock).

10. Respondent Peter Ritz ("Ritz") is an individual residing in the State of Pennsylvania, with a permanent residence located at 1230 Wrack Road, Rydan Pennsylvania 19046.

11. Respondent Ritz is a Director and the CEO of LZG.

12. Respondent Ritz served on Genius' Board of Directors and served as Genius' Chief Revenue Officer until late September 2024.

13. Respondent Ritz is one of Genius' largest individual shareholders, owning 12,427,876 shares of Genius common stock (6.68% of outstanding Genius common stock).

14. Nominal Respondent VStock Transfer, LLC ("VStock") is a California limited liability company with a principal place of business located at 18 Lafayette Place, Woodmere, New York 11598.

Subject Matter Jurisdiction

15. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because there is a diversity jurisdiction and damages in excess of $75,000.00.

Personal Jurisdiction and Venue

16. The Court has personal jurisdiction over Respondent LZG because Respondent LZG is headquartered in New York.

17. The Court has personal jurisdiction over Nominal Respondent VStock because its principal place of business is located in New York.

Background

The Asset Purchase Agreement

18. In late 2023, LZG sought out Genius to negotiate an asset purchase proposal.

19. Ritz, a director and CEO of LZG, met Roger Hamilton, ("Hamilton"), a director and CEO of Genius, to discuss and negotiate a potential asset purchase proposal between Genius and LZG.

20. On January 24, 2024, Genius entered into the Asset Purchase Agreement with Respondent LZG.

21. Pursuant to the Asset Purchase Agreement, Genius acquired certain assets and liabilities of LZG, through the purchase of 100 percent of the stock of LZG's subsidiary of FB Primesource Acquisition, LLC ("FBPA").

22. The assets held by FBPA appeared beneficial to Genius and its business operations and was the main reason why Genius agreed to enter into the Asset Purchase Agreement with LZG.

23. The assets of FBPA include 100 percent stock ownership of: (i) Prime Source LLP; (ii) Digitalism LLP; (iii) InFin-IT-Solution LLP; (iv) Prime Source Innovation, LLP; and (v) Prime Source-Analytical Systems LLP.[1]

24. As consideration for the purchase of LZG's assets, LZG would receive 73,873,784 shares of Genius common stock and both Ritz and Moe would become officers of Genius; Ritz subsequently became Chief Revenue Officer and Moe became Board Director Chairman. Ritz would also remain as President of FBPA.

## The Power of Attorney

25. On May 17, 2022, LZG entered into a Master Stock Purchase Agreement ("MSPA") to purchase Prime Source Group ("PSG") for a purchase price of approximately $18,000,000 from two individuals from Kazakhstan, Yevgeniy Chsherbinin ("Chsherbinin") and Victor Nazarov ("Nazarov").

26. PSG, which consisted of Prime Source LLP, Prime Source Innovation, LLP and Prime Source-Analytical Systems LLP, accounted for the majority of the assets and 100 percent of the operating revenue that Genius believed it was purchasing within FBPA.

27. On January 10, 2024, a series of documents were executed by Chsherbinin and Nazarov, and Ritz on behalf of FBPA.

---

[1] The five assets under FBPA are collectively referred to herein as PSG.

28. The January 10, 2024 documents include a standstill agreement between FBPA and Chsherbinin ("Standstill Agreement 1") (**Exhibit 2**), a standstill agreement between FBPA and Nazarov ("Standstill Agreement 2") (**Exhibit 3**), a debt settlement agreement between FBPA and Chsherbinin (Debt Settlement Agreement 1") (**Exhibit 4**), a debt settlement agreement between FBPA, LLC and Nazarov ("Debt Settlement Agreement 2," (**Exhibit 5**) and with the Debt Settlement Agreement, the "Debt Settlement Agreements," and collectively with Standstill Agreement 1 and Standstill Agreement 2, the "Power of Attorney").

29. The Power of Attorney allows Chsherbinin and Nazarov to take back their respective ownership of PSG if they did not receive the full payment that was owed by FBPA.

30. The Power of Attorney is an encumbrance on PSG, making the assets thereunder not freely and fully transferable, alienable, or licensable by LZG or FBPA.

31. The Asset Purchase Agreement explicitly stated that, "LZG is the sole and exclusive legal and beneficial owner of all right, title and interest in and to the Owned IP, and all Owned IP is freely and fully transferable, alienable, and licensable by LZG without restriction and payment of any kind to any third party …." *See* **Exhibit 1**, at § 8.7(a).

32. The Asset Purchase Agreement explicitly defines "Owned IP" as "all Intellectual Property on which LZG and/or any of its subsidiaries or affiliates has an ownership interest, including, but not limited to the Intellectual Property identified on Exhibit 1." *Id.* at § 1.1(aa).

33. The "Intellectual Property" identified on Exhibit 1 annexed to the Asset Purchase Agreement includes PSG. *See* **Exhibit 1** at P. 32, Exhibit 1 to the Asset Purchase Agreement.

34. Before entering into the Asset Purchase Agreement, Respondents knew of the Power of Attorney, which is an encumbrance on the assets under PSG.

35. Respondents did not disclose the Power of Attorney or any encumbrance on LZG's assets to Genius, including PSG, despite being required to do so during the due diligence process, and as represented and warranted by LZG in the Asset Purchase Agreement.

36. Respondents' failure to disclose Power of Attorney or any encumbrance on LZG's assets is a material omission under the Asset Purchase Agreement.

37. While Genius was aware of an outstanding debt obligation owed to Chsherbinin and Nazarov, which was disclosed by LZG during the due diligence as $9,000,000 remaining to be paid of the $18,000,000 purchase price of PSG, Respondents did not disclose the Power of Attorney concerning PSG with Genius, and Genius was unaware that ownership of PSG could return to Chsherbinin and Nazarov if payments were not made in the full amount, nor that the outstanding amount may escalate on an ongoing basis.

38. Genius reasonably relied on Respondents' representations before entering into the Asset Purchase Agreement that LZG's assets, including PSG, were not encumbered and are freely and fully transferable.

39. Respondents knew or should have known that Genius relied on their representations and warranties before entering into the Asset Purchase Agreement.

40. But for Respondents' material omission that PSG had an encumbrance from the Power of Attorney, Genius would not have entered into the Asset Purchase Agreement.

41. In March 2024, Hamilton, the CEO of Genius, became aware of the Power of Attorney and requested the Power of Attorney documents from Ritz.

42. On March 28, 2024, Ritz sent Hamilton a Dropbox link containing various documents and insisted that the Power of Attorney was in the documents sent.

43. The documents sent by Ritz did not contain the requested Power of Attorney, and Hamilton proceeded to press Ritz for copies of the Power of Attorney documents.

44. On March 29, 2024, Ritz provided Hamilton with the Power of Attorney Documents.

45. Under the Asset Purchase Agreement, Genius had agreed to pay up to $15,000,000 in LZG liabilities held by FBPA. Genius believed this included the full amount outstanding to Chsherbinin and Nazarov for the purchase of PSG.

46. Genius proceeded to make payments in the aggregate amount of $6,595,180 between March and August 2024 towards the purchase of PSG.

47. Since payments were not being made fast enough, Genius asked Ritz to negotiate an extension for the final payments to PSG.

48. During the negotiations, Chsherbinin and Nazarov wanted to start charging excessively high monthly penalties and began threatening to use their Power of Attorney to take back PSG without any refund for payments made unless the monthly penalty payments were made. The size of the penalty payments demanded increased over time to the extent the purchase price grew from $18,000,000 to over $25,000,000.

49. Additionally, Chsherbinin and Nazarov refused to permit Genius to start integrating PSG's assets with Genius' business operations until the outstanding debt was paid in full.

50. Integrating PSG's assets with Genius' business operations was the main incentive for Genius to enter into the Asset Purchase Agreement.

51. Genius disagreed with the monthly penalty amounts proposed by Chsherbinin and Nazarov, as they were beyond the maximum purchase price negotiated for under the Asset Purchase Agreement and asked Moe and Ritz to continue negotiations with Chsherbinin and Nazarov.

52. In August 2024, Genius asked Moe and Ritz to reassign the Power of Attorney from Chsherbinin and Nazarov to Genius to provide the level of security that had been represented and

warranted at the time the Asset Purchase Agreement was signed, to ensure that payments could continue.

53. To date, no amicable agreement has been made on the final payments towards PSG, and the outstanding Power of Attorney remains in effect and in possession of Chsherbinin and Nazarov.

54. As a result of Respondents' breach of Representations and Warranties under the Asset Purchase Agreement and Respondents' misrepresentations, Genius remains in the compromising position of losing its claim of ownership over PSG to Chsherbinin and Nazarov who continue to hold the Power of Attorney encumbrance.

### Ritz and Moe Voted Against the Best Interest of Genius

55. On or about April 15, 2024, Genius held a meeting of its Board of Directors to approve the entry into financing transactions with an investor unnamed in Genius' public disclosure filings, including the issuance of a $5.72 million non-convertible promissory note in exchange for $5 million in funding and a warrant agreement.

56. As officers of Genius and the officers of LZG, which controlled the voting of the 73,873,784 Genius shares held by LZG as a part of the Asset Purchase Agreement, on April 29, 2024, Ritz executed a voting agreement ("Voting Agreement 1") (**Exhibit 6**) and Moe executed a voting agreement ("Voting Agreement 2, (**Exhibit 7**) and with Voting Agreement 1, the "Voting Agreements") in connection with the promissory note and warrant agreement with the investor unnamed.

57. Under the terms of the Voting Agreements, Ritz and Moe agreed to vote: (i) in favor of a proposal for the allotment and issuance of Genius common shares pursuant to the warrant agreement; (ii) in favor of authorizing the Genius Board to effect at its discretion a reverse stock split involving Genius' common shares; and (iii) against any proposal that would result in a breach

of any of Genius' covenants, representations, obligations or agreements under the Funding Transactions. *See* **Exhibits 6-7**, at § 1.01

58. At the time the Voting Agreements were executed, Ritz and Moe controlled 73,873,748 shares of Genius's outstanding voting common stock.

59. In August 2024, in breach of their Voting Agreements, Ritz and Moe deliberately chose to breach their agreement and to not vote their shares in favor of authorizing the Genius Board to effect at its discretion a reverse stock split, ultimately resulting in Genius being in breach with the investor unnamed.

60. Additionally, as a result of the Voting Agreements being breached, and without shareholder approval to authorize a reverse stock split in the event its share price dropped below NYSE American Stock Exchange's listing criteria, Genius was at risk of being delisted from the NYSE American Stock Exchange.

61. Ritz and Moe's breach of their Voting Agreements was in direct contrast to the best interest of Genius, as Genius ended up breaching the promissory note and the warrant with the investor unnamed, as well as putting Genius at risk of being delisted from the NYSE American Stock Exchange. These breaches and delisting risks are currently ongoing and represent ongoing risks to the company.

The Genius Stock Transfer Request

62. On September 26, 2024, LZG shareholders sent a letter (Demand Letter) (**Exhibit 8**) to VStock, Genius' transfer agent, and demanded that VStock transfer the 73,873,748 shares (7,387,374 shares after the reverse stock split in August 2024) of Genius common stock, which are currently held under the ownership of LZG pursuant to the Asset Purchase Agreement.

63. On September 30, 2024, Hamilton emailed the CEO of VStock, Yoel Goldfeder ("Goldfeder"), stating that Genius does not approve of the release of Genius shares from the restrictive legends, nor does it approve of the distribution of these Genius shares to any party.

64. On September 30, 2024, Goldfeder sent Hamilton a response letter, stating that unless Genius ascertains an injunction, VStock is obligated to process any transfer requests duly submitted by Genius' shareholders.

PRAYER FOR RELIEF

Accordingly, in order to prevent VStock (and any future transfer agents) from honoring any of Respondents' or LZG shareholders' improper request for the issuance and transfer of Genius shares of common stock, as well as appointing a third-party trustee to serve as a proxy for Respondents' voting shares at any and all Genius shareholder meetings, and preventing Respondents from participating in Genius shareholder meetings and voting with Genius shares of common stock, Genius now seeks from the Court a temporary restraining order and preliminary injunction, and any other relief that the Court deems proper.

DATED:    Jericho, New York
          November 7, 2024

                                              Respectfully submitted,

                                              **THE BASILE LAW FIRM P.C.**

                                              */s/ Christopher M. Basile*
                                              Christopher M. Basile, Esq.
                                              390 North Broadway, Suite 140
                                              Jericho, NY 11753
                                              Tel.:  (516) 455-1500
                                              Fax:   (631) 498-0748
                                              Email: chris@thebasilelawfirm.com

                                              *Counsel for Petitioner Genius Group Limited*